0F373 - A1    Franklin County Ohio Clerk of Courts of the Common Pleas- 2021 Jan 14 1:04 PM-21CV000268

## IN THE COURT OF COMMON PLEAS
### FRANKLIN COUNTY, OHIO

| | | |
|---|---|---|
| GUARDIANS FOR THE ANIMALS<br>OF OHIO<br>PO Box 345<br>Sharon Center, Ohio 44274 | ) ) ) ) ) | Case No. |
|      Plaintiff, | ) ) | Judge |
|      vs. | ) ) ) | |
| FRANKLIN COUNTY ANIMAL CARE<br>AND CONTROL<br>340 Tamarack Blvd.<br>Columbus, Ohio 43229 | ) ) ) ) ) | **COMPLAINT WITH REQUEST FOR<br>INJUNCTIVE, DECLARATORY, AND<br>MANDAMUS RELIEF** |
| KAYE PERSINGER,<br>in her official capacity as Director of Franklin<br>County Animal Care and Control<br>340 Tamarack Blvd.<br>Columbus, Ohio 43229 | ) ) ) ) ) ) | **JURY DEMAND ENDORSED HEREIN** |
| ANDREW KOHN,<br>in his official capacity as Community Relations<br>Manager of Franklin County Animal Care and<br>Control and individual capacity<br>340 Tamarack Blvd.<br>Columbus, Ohio 43229 | ) ) ) ) ) ) ) | |
| FRANKLIN COUNTY BOARD OF<br>COMMISSIONERS<br>373 South High Street, 26th Floor<br>Columbus, Ohio 43215 | ) ) ) ) ) | |
| FRANKLIN COUNTY AUDITOR<br>373 South High Street, 21st Floor<br>Columbus, Ohio 43215 | ) ) ) ) | |
| JOHN DOE 1-3<br>340 Tamarack Blvd.<br>Columbus, Ohio 43229 | ) ) ) ) ) | |
|      Defendants. | ) | |


EXHIBIT
F

## INTRODUCTION

This is an action seeking injunctive relief, declaratory relief, mandamus relief, and damages. Primarily, this action arises under U.S.C. Section 1983 as a result of the unconstitutional violation of first amendment speech and retaliatory conduct in contravention of Plaintiff's rights under the First Amendment to the Constitution of the United States and Article 1 of the Ohio Constitution. Plaintiff also seek attorney fees and costs pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1988.

## JURISDICTION AND VENUE

1. The Franklin County Court of Common Pleas has jurisdiction as the Plaintiff's claims against Defendants are based upon 42 U.S.C. § 1983, which authorizes actions to redress the deprivation, under color of state law, of rights, privileges, and immunities secured to the Plaintiff by the Constitution of the United States.

2. Plaintiff's claims for declaratory relief and compensatory damages are sought under 28 U.S.C. §§ 2201 and 2202 and corresponding Ohio provisions.

3. Plaintiff's claims for attorney's fees and costs are predicated upon 42 U.S.C. § 1988, which authorizes the award of attorney's fees and costs to prevailing parties pursuant to 42 U.S.C § 1983.

4. Venue is conferred by 28 U.S.C § 1391(b) and as Defendants' primary place of business is Franklin County, Ohio and the events giving rise to this claim occurred in Franklin County, Ohio.

## PARTIES

5. Plaintiff hereby incorporates by reference all allegations contained in all numbered paragraphs of this Complaint as if set forth fully here.

6. Plaintiff Guardians for the Animals of Ohio (Guardians) is a nonprofit 501(c)(3) Ohio corporation based in Franklin County, Ohio that acts as an animal shelter/animal rescue for dogs

by focusing its nonprofit efforts on the rescue of dogs with behavioral and medical needs that are beyond the care capacity of governmental shelters.

7. Pamela Price (Price) is the President of Guardians for the Animals of Ohio and a resident of Franklin County, Ohio with a particular interest in animal rescue and welfare.

8. Defendant Franklin County Animal Care and Control (FCACC) is the Franklin County, Ohio dog shelter that houses dogs impounded by a county dog warden organized pursuant to ORC §955.15.

9. Franklin County, Ohio is a public body.

10. Defendant Franklin County Board of Commissioners (Board) controls, funds, and otherwise operates FCACC pursuant to ORC §955.15.

11. Defendant Kaye Persinger (Persinger) is the current Director of FCACC and Supervisor of Defendant Andrew Kohn.

12. Defendant Andrew Kohn (Kohn) is the current Community Relations Manager of FCACC and serves as its public records officer.

13. The Facebook user profile "Haley Hound" is an anonymous social media account created and utilized by FCACC and Defendant Kohn, as well as doe defendant(s).

14. The actions of FCACC, the Board, Persinger, and Kohn are often collectively referred to as actions of FCACC in this Complaint, as the shelter itself is likely not a *sui juris* entity.

15. Defendant Franklin County Auditor (Auditor) is the county office that manages county dog registrations pursuant to ORC §955.01.

16. At all relevant times, Franklin County, FCACC, the Board, and the Auditor acted by and through its agents, servants, and employees, including but not limited to its employees, both named in this action, and unknown employees, not named, but to be discovered.

## FACTUAL ASSERTIONS

17. Although there is no shortage of dogs in Ohio requiring rescue and adoption, Guardians has long been concerned about the plight of dogs in the FCACC shelter, which, despite being the highest intake and highest funded county-operated shelter in Ohio, has traditionally failed to implement basic industry standard shelter management programs to ensure successful outcomes for the dogs in its care, such as a public foster home program for dogs who fail to thrive in a shelter environment.

18. Because of FCACC's failure to implement basic industry standard live-saving programs, most dogs with behavioral or medical concerns that fall into the custody of FCACC have, statistically speaking, no chance of survival unless such dogs are taken into the custody of outside animal rescues or shelters.

19. On or about October 11, 2018, Guardians entered into a mutually satisfactory relationship with FCACC by acting as its "rescue partner."

20. This relationship entailed FCACC transferring ownership of dogs to Guardians that were beyond the shelter's capacity for care, including dogs with serious behavioral or medical concerns.

21. FCACC would set deadlines, commonly referred to as "pull dates," by which a rescue partner such as Guardians must commit to take ownership of the subject dog.

22. FCACC publishes a list of dogs with "pull dates" on its website and often claims that such list is not a "kill list," when in fact, dogs that are not taken by Guardians or other rescue partners by the "pull date" are euthanized (killed) by FCACC.

23. FCACC writes descriptions of the dogs with "pull dates" that purposely attempt to mislead or pacify the public by avoiding the use of the word euthanasia/kill such as: "**UPDATE** URGENT 1/11 We are unable to continue to adequately provide for Jane given her continuing

behavioral decline. We are now asking for rescue assistance that she be pulled within the next 5 days. If she is not pulled within 5 days, we may, unfortunately, need to make a difficult decision regarding Jane?s [(sic)] future."

24. FCACC does not traditionally utilize Facebook or other social media to advertise the dogs with "pull dates," despite such methods traditionally being used across the animal welfare industry.

25. At all times relevant, in addition to acting as a rescue partner, Guardians maintained a public Facebook page for its organization.

26. At all times relevant, Guardians used its public Facebook page to advertise the FCACC dogs with "pull dates" in order to find foster homes or other rescue partners to commit to the subject dog.

27. Guardians' social media advertisements of the "pull date" dogs routinely received thousands of views and interactions from across the United States, successfully bringing attention to these dogs and often saving their lives.

28. As a public Facebook page, third-party Facebook users unaffiliated with Guardians are able to comment on, share, and "react" to Guardians' posts.

### The Suspension and Initial Records Request

29. On or about January 6, 2020, Defendant Persinger issued a letter via Defendant Kohn suspending Guardians' rescue partner relationship with FCACC. A true and accurate copy of the email and letter is attached as **Exhibit A**.

30. Defendant Persinger stated that the reason for the suspension was because third-parties have posted content on Guardians' public Facebook page that allegedly included critical commentary about FCACC.

31.  As part of the suspension letter, Defendant Persinger indicated that the relationship would be terminated unless Guardians met with her in person.

32.  On or about January 6, 2020, Guardians responded to Defendant Kohn via email requesting scheduling of the meeting required by Defendant Persinger. A true and accurate copy of the email is attached as **Exhibit B**.

33.  On or about January 12, 2020, Guardians responded to Defendant Kohn via email requesting public records related to the complained of commentary. A true and accurate copy of the email is attached as **Exhibit C**.

34.  On or about January 16, 2020, Guardians, via counsel, responded to Defendant FCACC and Defendant Persinger via email and again requested the public records related to the complained of commentary. A true and accurate copy of the email and letter is attached as **Exhibit D**.

35.  On or about January 29, 2020, Defendant Persinger responded to Guardians' counsel via email. A true and accurate copy of the email is attached as **Exhibit E**.

36.  The January 29, 2020 email contains a response to the records request, specifically 2 attachments containing approximately 20 screencaptures of comments that appear to be from the Facebook platform, as well as commentary from Defendant Kohn. A true and accurate copy of the email attachments is attached as **Exhibit F**.

37.  The subject public record screencaptures were cropped and otherwise modified from their original form by Defendant Kohn.

38.  The subject public record screencaptures were created in response to the records request by Defendant Kohn.

39.  Defendant Kohn writes in one email attachment "The issue with Guardians – and what we told them – was the fact that they let malicious and false statements remain throughout the

comments section of their posts without ever addressing them. I have attached 10 – but could probably find hundreds if I was to continue looking. They certainly can allow them but it's not becoming of a shelter partner – and they have no 'right' to be an approved rescue."

40. Only four of the subject public record screencaptures were posted by third party Facebook users unaffiliated with Guardians prior to January 6, 2020, the date of the suspension letter; all of the other subject public record screencaptures were posted after the suspension.

41. The January 29, 2020 email by Defendant Persinger contains the statement that "volunteers and members of the public forwarded [the comments contained in the public records response] to dog shelter staff[.]".

42. The January 29, 2020 email by Defendant Persinger contains the statement that "[a] direct message was sent to the administrator of the [Guardians] page and asked to kindly remove or hide the comments, as the comments were perceived by many as an effort to discredit the dog shelter, staff and volunteers."

43. No direct message was ever sent by FCACC or its agents to Guardians.

44. The January 29, 2020 email by Defendant Persinger contains the statement that Guardians "was later informed the organization was not currently suspended from rescuing or the adoption of dogs", despite such statement being untrue.

45. On February 5, 2020, Guardians, by counsel, responded to the January 29, 2020 email. A true and accurate copy of the email is attached as **Exhibit G**.

46. The February 5, 2020 email made additional records requests, including for (1) a copy of the direct message that the January 29, 2020 email alleges was sent to Guardians in December 2019; (2) a copy of the communication lifting Guardians' suspension; and (3) copies of the original

unaltered screencaptures and the original communication(s) received about them from "volunteers and members of the public."

47. The February 5, 2020 email further requests the meeting that was previously demanded by Defendant Persinger be scheduled.

48. On or about February 28, 2020, Guardians, via its public Facebook page notified the public that its relationship with FCACC had been suspended and that attempts to remedy the issue had gone ignored by FCACC and Defendant Persinger.

49. On or about February 28, 2020, Defendant Persinger, via her personal Facebook page, responded to Guardians' post and claimed in a public posting that she had not received Guardians' counsel's February 5, 2020 email.

50. The February 28, 2020 Facebook posting by Defendant Persinger claimed that Guardians would be welcome to return as a rescue partner if Guardians applied as a "New Hope Partner."

51. The New Hope Agreement attempts to restrict the free speech of partner rescues by forcing them to agree that "[d]isparaging comments in public, person, print, or through social medial are harmful to both parties and undermine the mission of this agreement; such conduct may result in termination of agreement."

52. Individual persons who purchase dogs from FCACC are not subject to the same terms or restrictions as rescue partners pursuant to the terms of the New Hope Agreement, despite rescue partners also being require to pay a purchase price to FCACC for dogs.

53. The New Hope Agreement requires that rescue partners purchase dog registrations "within 30 days of removal from the shelter, in accordance with section 955.012 or 955.16 of the Ohio Revised Code."

54.  On or about September 2, 2020, Guardians' counsel emailed Defendant Persinger to inquire about when the records requested on February 5, 2020 would be produced. A true and accurate copy of the email is attached as **Exhibit H**.

55.  On or about October 14, 2020, Guardians' counsel spoke with and emailed Franklin County Assistant Prosecutor Nick Soulas requesting the records that had not yet been received. A true and accurate copy of the email is attached as **Exhibit I**.

56.  On or about November 17, 2020, Guardians' counsel again followed up with the Franklin County Prosecutor's Office about the records requested on February 5, 2020. A true and accurate copy of the email is attached as **Exhibit J.**

57.  On or about December 15, 2020, Guardians' counsel again followed up with the Franklin County Prosecutor's Office about the records requested on February 5, 2020. A true and accurate copy of the email is attached as **Exhibit K.**

58.  To date, no response has been received to the February 5, 2020 records request from FCACC, the Board, Defendant Persinger, or Defendant Kohn.

### Dog Registrations

59.  In 2018 and 2019, Guardians submitted a number of dog registration applications to Defendant Auditor for its rescue dogs, rendered payment for such registrations, and received registrations.

60.  In 2020, Guardians submitted a number of dog registration applications to Defendant Auditor for its rescue dogs pursuant to ORC §955.01(C).

61.  Pursuant to ORC §955.01(C), Guardians did not render payment with such applications in 2019 and 2020.

62.  On or about March 3, 2020, Guardians contacted the Auditor regarding no cost registrations for its rescue dogs pursuant to pursuant to ORC §955.01(C).

63.  On or about March 4, 2020, the Auditor responded via email and indicated that it will not provide "free" registrations for 501(c)(3) nonprofit rescue organizations.

64.  Guardians exchanged several emails with the Auditor regarding this issue subsequent to the March 4, 2020 response and to date, has received no 2020 registrations from the Auditor for its dogs.

65.  FCACC continues to require its rescue partners to purchase dog registrations "within 30 days of removal from the shelter."

### More Records Requests

66.  On or about September 11, 2020, Guardians issued three records request letters to FCACC via Defendant Kohn. A true and accurate copy of the requests are attached as **Exhibit L.**

67.  Receipt of the requests was acknowledged by Defendant Kohn via email on September 14, 2020.

68.  On or about October 12, 2020, Defendant Kohn responded to the September 11, 2020 records requests. A true and accurate copy of the response letter is attached as **Exhibit M.**

69.  The response to the September 11, 2020 records request was largely a denial for being "overly broad," but also included direction to request records from non-records holding offices, such as the "Franklin County Data Center."

70.  The response specifically denies a request for records created or otherwise held by the Facebook account "Haley Hound," despite admitting such account is "the Franklin County Dog Shelter."

71.  On or about October 14, 2020, Guardians' counsel spoke with and emailed Franklin County Assistant Prosecutor Nick Soulas regarding the insufficient response to the September 11, 2020 records request and how such records could easily be produced. A true and accurate copy of the email is attached as **Exhibit N**.

72.  To date, no sufficient response has been received to the September 11, 2020 records request from FCACC, the Board, Defendant Persinger, or Defendant Kohn.

<b>Facebook and Another Records Request</b>

73.  On or about November 17, 2020, Guardians issued a records request letter to FCACC via Defendant Kohn. A true and accurate copy of the request is attached as **Exhibit O**.

74.  Receipt of the requests was acknowledged by Defendant Kohn via email on November 17, 2020.

75.  The request pertained to comments made on the FCACC operated public Facebook page located at https://www.facebook.com/FranklinCountyDogs.

76.  Facebook is a social media platform with over 2.2 billion users worldwide, including 184 million daily active users in the United States and Canada.

77.  The platform allows users to create a "profile" under their name and photograph where they can curate their online presence by posting content on their "wall" (a virtual bulletin board), including text, photos, videos, and external links. Users are able to "friend" one another, which enables them to see and comment on each other's posts and walls. They may do so in their "news feed," the home-screen for all Facebook users that displays a timeline of posts and activity based on an algorithm that determines interest and relevancy for individual users.

78.  Facebook also allows individuals and organizations to create their own "Pages." Pages offer different privacy, publishing, and content moderation functionality than individual user profiles.

Generally speaking, Pages are more public and less private. Using default settings, any member of the public is able to view posts on an organization's Page as well as comment on that Page. Users may also "follow" a Page, in order to receive notifications about activity on the Page or see Page posts in their news feed. Users can also "like" a Page, which will be viewable on their own user profile and automatically follow the organization's Page.

79. *Page Privacy Settings.* All Pages on Facebook are public by default. To remove a Page from public view, the administrator of the Page must "unpublish" it. Organizations can put age and country restrictions on a Page to limit who can view it. Organizations can also ban individual Facebook users from posting on, commenting on, and liking their Page, but banning will not prevent users from viewing the Page.

80. *Page Posting Settings.* Organizations can post text, photo, and video content on their Page, as well as links to outside content. Individual Facebook users may "comment" under posts created by the Page administrators. Additionally, individual Facebook users can initiate their own posts to an organization's Page. These posts are located under the "Visitor Posts" tab. Visitor posts include original content placed specifically on the Page by third parties, as well as instances where users "tag" (or link to) the organization on their own user profiles. Organizations can disable visitor post functionality or require manual administrator review and prior approval of every visitor post before it is viewable to the general public.

81. *Page Moderation Settings.* Organizations operating a Facebook Page may filter out posts and comments submitted by visitors so that they do not appear publicly on the organization's Page. There is a generalized profanity filter that organizations can elect to turn on. Page administrators can also establish a customized filter consisting of "blocked" words. If a blocked word appears in a visitor's post or comment, that content will be automatically and immediately hidden from the

Page. An organization can manually "unhide" comments subject to the filter. Organizations can also manually hide or delete individual comments.

82. FCACC maintains a Facebook Page: https://www.facebook.com/FranklinCountyDogs. FCACC's Facebook Page has over 88,000 followers and has received over 84,000 "likes" from Facebook users. FCACC regularly posts information about dogs available for adoption or rescue and information about FCACC programs and events.

83. *Posting.* On FCACC's Facebook Page, both FCACC and guests to the Page can post text and other media on FCACC's wall. On the left of the Page is a list of content such as Home, Posts, and Photos. The "Home" section lists only FCACC-generated media, but guests can comment on each post.

84. *Commenting.* Guests have the ability to comment on all posts – whether generated by FCACC or a visitor. Some posts receive hundreds of comments. A Facebook algorithm displays "top" comments based on relevance and popularity, but users may choose to view them all. Users frequently engage with visitor posts by "reacting" to them (for example, by "liking" them), commenting on them, or sharing them to their own Facebook profile. The type and tone of comments varies widely. Many comments include substantive discussions about FCACC administration decisions and controversies.

85. *Social Media Policy.* FCACC has posted a social media policy on the Facebook page. It states that visitor generated content must meet the following standards or face removal:

> "1. We believe debate and disagreement are constructive, but personal attacks, trolling, and abuse will not be tolerated. The key to a great community experience is an engaging and inclusive space where everyone can learn and grow. Inappropriate comments and language, including those in private messages, will be deleted and may eventually lead to your removal from our page.
> 2. We love passionate engagement and dialogue. Seriously, we do. But comments and discussions that are not relevant to, or detract from, a post

> will be deleted. Our posts are meant to celebrate shelter dogs, volunteers,
> staff, and our community, and comments that do not help lift-up or support
> the subject of a post will be removed. Continued violation of this principle
> may eventually lead to your removal from our page."

86. FCACC acknowledges that comments posted to its Facebook Page are communications to

FCACC, and thus the Franklin County government.

87. Clicking on FCACC's "Visitor Posts" tab shows that FCACC allows the general public to

post on a wide variety of topics. This further shows that FCACC has allowed its Facebook Page

to exist generally as a forum for the open expression of ideas without regard to political affiliation,

issue area, or whether the topic contradicts FCACC policies.

88. Other visitor posts on the FCACC Facebook Page show community members responding

directly to FCACC actions and opening a dialogue about positions taken by FCACC.

89. In light of all of the foregoing, FCACC's Facebook Page is a designated public forum for all

speech by all speakers, or at least designated for speech about FCACC or topics relevant to

FCACC. At an absolute minimum, it is a non-public forum where private speech is nonetheless

encouraged and permitted.

90. On or about December 17, 2020, Defendant Kohn responded to the November 17, 2020

records request pertaining to a posting made on the FCACC Facebook Page.

91. The response included a handwritten notation on the public record that a subject comment had

been deleted by the user who posted it. A true and accurate copy of the notated record is attached

as **Exhibit P**.

92. The comment was, in fact, not deleted by the user, but was manually hidden by FCACC,

Defendant Kohn, and/or a Doe Defendant.

93. The comment from was critical of FCACC, but was not profane or otherwise disruptive.

94. To date, the subject comment remains posted, but hidden by FCACC and unavailable for public review by users other than those that are the specific user's approved "friends," thus, the public can no longer interact with the subject comment.

95. After its suspension from FCACC, Guardians and Price noticed that content they attempted to post to the FCACC Facebook Page often disappeared from public view.

96. On or about December 30, 2020, Price, acting as an agent of Guardians, posted a comment on the FCACC Facebook page stating: "Franklin County Dog Shelter & Adoption Center perhaps more rescues would work with Franklin County if the rescue contract was not so restrictive and contained provisions that are not equally applied to adopters or fosters."

97. On or about December 30, 2020, various third party Facebook users responded to Price's comment, including an individual named Loretta Thompson.

98. On or about December 30, 2020, FCACC, Defendant Kohn, and/or a Doe Defendant manually hid comments from third parties who responded to Price, including the comment from Thompson.

99. The comment from Thompson was critical of FCACC, but was not profane or otherwise disruptive.

100. To date, the subject comment from Thompson remains posted, but hidden by FCACC and unavailable for public review by users other than those that are the specific user's approved "friends," thus, the public can no longer interact with the subject comment.

101. On or about January 11, 2021, Price, acting as an agent of Guardians, posted a comment on the FCACC Facebook page stating: "I am very glad to see you are finally allowing comments for some of the dogs on the rescue list (Frank & Brennan) even though you require volunteers to sign a rescue dog contract which states they can not post their personal experiences about the rescue dogs on any social media platform. Since you are allowing volunteer comments for Frank &

Franklin County Ohio Clerk of Courts of the Common Pleas- 2021 Jan 14 1:04 PM-21CV000268

Brennan will you be opening up volunteer comments for the other dogs on the rescue list?? Can we please get volunteer comments for Jane who is on the urgent rescue list for Saturday?"

102. On or about January 11, 2021, FCACC, Defendant Kohn, and/or a Doe Defendant responded to Price's comment: "Pamela Anne Marie The above comment is untrue. Volunteers are always, and have always, been able to comment on dogs available for adoption. It is wrong to suggest otherwise. Let's focus on the positives about these long-term dogs and save the negative energy for another day. It certainly won't help these lovely dogs find homes."

103. On or about January 11, 2021, Price responded to the FCACC comment: "Franklin County Dog Shelter & Adoption Center first off if you would have actually read my comment I stated it was great your letting them comment but was referring to the rescue only dogs in that post Frank and Brennan & asked if shelter is going to let volunteers comment on those rescue dogs now even though the rescue contract they signed forbids them. I can forward you the contract the shelter has them sign which states the fact for your records!"

104. On or about January 11, 2021, FCACC, Defendant Kohn, and/or a Doe Defendant manually hid Price's responsive comment from third parties.

105. The subject comment from Price was corrective of FCACC's comment, but was not profane or otherwise disruptive.

106. To date, the subject comment remains posted, but hidden by FCACC and unavailable for public review by users other than those that are the specific user's approved "friends," thus, the public can no longer interact with the subject comment.

## CLAIMS FOR RELIEF
## COUNT 1
## FIRST AMENDMENT RETALIATION -FREEDOM OF SPEECH
## AS TO TERMINATION OF THE RESCUE PARTNERSHIP
## DEFENDANTS FCACC, BOARD, PERSINGER, AND KOHN

107. Plaintiff hereby incorporates by reference all allegations contained in all numbered paragraphs of this Complaint as if set forth fully here.

108. Plaintiff avers that its actions in maintaining a public Facebook page where it and the public can express views and concerns about the care of animals, the misuse of public funds, and general failure of government to operate properly and efficiently, is protected expression regarding matters of public concern.

109. Plaintiff avers that its interest in First Amendment expression as a citizen outweighs any disruptive effect that its communications or the communications of third parties may have created in the operations of FCACC, and that as a result, the Plaintiff was deprived of the privilege and benefits of rescuing dogs, and that a causal relationship exists between its protected expression on matters of public concern as a citizen and the aforementioned adverse action.

110. The actions complained of herein by Defendants FCACC, the Board, Persinger, and Kohn violated the Plaintiff's right to free speech under the First Amendment of the U.S. Constitution and similar provisions of the Ohio Constitution.

111. After pretextually terminating the rescue privileges of Guardians in response to Plaintiff's speech, FCACC would not restore its rescue privileges unless Guardians agreed to waive its constitutional rights under the First Amendment of the Constitution.

112. Defendants' actions are an infringement of both property and liberty right.

113. Plaintiff, and others similarly situated, have no adequate remedy at law and will suffer serious and irreparable harm to their constitutional rights unless Defendants are enjoined from continuing

their unlawful policies, practices, customs, procedures, standards and/or methods, which have directly and proximately caused such constitutional abuses.

114. Plaintiff is entitled to its costs, including its reasonable attorneys' fees, pursuant 42 U.S.C. 1988.

115. As a direct and proximate result of the acts as stated herein by each of the Defendants, Plaintiff's constitutional rights have been violated which has caused it and its agents to suffer mental and emotional injury and pain, suffering, humiliation and embarrassment, as will more fully appear at trial.

## COUNT 2
### FIRST AMENDMENT RETALIATION -FREEDOM OF SPEECH
### AS TO CENSORSHIP OF A PUBLIC FORUM BY A GOVERNMENT ENTITY
### DEFENDANTS FCACC, BOARD, PERSINGER, KOHN, AND DOE

116. Plaintiff hereby incorporates by reference all allegations contained in all numbered paragraphs of this Complaint as if set forth fully here.

117. Like other public figures and governmental agencies that use their social media profiles for communicating with the broader populace, the FCACC Facebook Page is interactive. It provides a platform for constituents to voice their approval of FCACC's policies and practices—and purportedly their critiques—along with an opportunity for FCACC to respond. For all intents and purposes, the FCACC Facebook Page is a public forum—hosted by a government agency—subject to the First Amendment.

118. Plaintiff avers that is ability to make commentary, including critical commentary, on a public Facebook page operated by the Defendants, a government agency, is protected expression regarding matters of public concern.

119. Plaintiff avers that its interest in First Amendment expression as a citizen outweighs any disruptive effect that its communications or the communications of third parties may have created in the operations of FCACC.

120. The actions complained of herein by Defendants FCACC, the Board, Persinger, Kohn, and Doe violated the Plaintiff's right to free speech under the First Amendment of the U.S. Constitution and similar provisions of the Ohio Constitution.

121. The Defendants' exercise of viewpoint, content, and speaker discrimination against Guardians and its agents on its Facebook Page continues a pattern and practice of the Defendants excluding Guardian's speech from the Defendants' forums.

122. The First Amendment recognizes and protects the right to freedom of association

123. Defendants, acting in their official capacity, and acting under color of state law, abridged and violated Plaintiff's right to freedom of association by denying it the ability to associate with those of its choosing, including those who also have an interest in the operation of FCACC and/or animal welfare, by censoring and hiding third party comments on its Facebook Page.

124. The FCACC Facebook Page constitutes a public forum under the United States and Ohio Constitutions.

125. At the time the Defendants restricted Plaintiff's comments from the Facebook Page, Defendants were acting under color of state law.

126. The Defendants' restriction of Plaintiff's comments was not content-neutral, nor narrowly tailored to serve important government interests, nor did it leave open ample alternative channels for communication. For these and other reasons, the Defendants' conduct infringed upon Plaintiff's rights under the First Amendment to the United States Constitution and the Ohio Constitution.

127. Plaintiff has no clear and adequate remedy at law for this violation of its constitutional rights and has suffered irreparable injury as a result of Defendants' conduct, which will continue unless and until enjoined by appropriate order of this court. Plaintiff is also entitled to compensatory damages, their costs, including their reasonable attorneys' fees, pursuant 42 U.S.C. 1988.

128. As a direct and proximate result of the acts as stated herein by each of the Defendants, Plaintiff's constitutional rights have been violated which has caused it and its agents to suffer mental and emotional injury and pain, suffering, humiliation and embarrassment, as will more fully appear at trial.

## COUNT 3
### FIRST AMENDMENT RETALIATION -FREEDOM OF SPEECH
### AS TO VIEWPOINT DISCRIMINATION BY A GOVERNMENT ENTITY
### DEFENDANTS FCACC, BOARD, PERSINGER, KOHN, AND DOE

129. Plaintiff hereby incorporates by reference all allegations contained in all numbered paragraphs of this Complaint as if set forth fully here.

130. Defendants censored Guardians and its agents from its Facebook Page because of the viewpoints it expressed on that Page.

131. This censorship of Plaintiff based on its viewpoints violated Plaintiff's right to freedom of expression under the United States and Ohio Constitutions, and 42 U.S.C. 1983.

132. Plaintiff has no clear and adequate remedy at law for this violation of its constitutional rights and has suffered irreparable injury as a result of Defendants' conduct, which will continue unless and until enjoined by appropriate order of this court. Plaintiff is also entitled to compensatory damages, their costs, including their reasonable attorneys' fees, pursuant 42 U.S.C. 1988.

133. As a direct and proximate result of the acts as stated herein by each of the Defendants, Plaintiff's constitutional rights have been violated which has caused it and its agents to suffer

mental and emotional injury and pain, suffering, humiliation and embarrassment, as will more fully appear at trial.

## COUNT 4
### FIRST AMENDMENT RETALIATION -FREEDOM OF SPEECH
### AS TO RECORDS DENIAL BY A GOVERNMENT ENTITY
### DEFENDANTS FCACC, BOARD, PERSINGER, KOHN, AND DOE

134. Plaintiff hereby incorporates by reference all allegations contained in all numbered paragraphs of this Complaint as if set forth fully here.

135. Plaintiff avers that as a result of its exercise of its First Amendment Rights, that Defendants have intentionally failed to respond, inadequately responded, or delayed to respond to public records requests issued by Guardians.

136. Plaintiff avers that Defendants routinely respond to third party public record requests in a period of under 7 days, while requests made by Guardians routinely take approximately 30 days or even go completely unanswered.

137. This censorship of Plaintiff based on its viewpoints violated Plaintiff's right to freedom of expression under the United States and Ohio Constitutions, and 42 U.S.C. 1983.

138. Plaintiff has no clear and adequate remedy at law for this violation of its constitutional rights and has suffered irreparable injury as a result of Defendants' conduct, which will continue unless and until enjoined by appropriate order of this court. Plaintiff is also entitled to compensatory damages, their costs, including their reasonable attorneys' fees, pursuant 42 U.S.C. 1988.

139. As a direct and proximate result of the acts as stated herein by each of the Defendants, Plaintiff's constitutional rights have been violated which has caused it and its agents to suffer mental and emotional injury and pain, suffering, humiliation and embarrassment, as will more fully appear at trial.

### COUNT 5
### FRAUD/TORTIOUS INTERFERENCE WITH CONTRACT
### AS TO THE TERMINATION OF THE RESCUE PARTNERSHIP
### DEFENDANT KOHN

140. Plaintiff hereby incorporates by reference all allegations contained in all numbered paragraphs of this Complaint as if set forth fully here.

141. Defendant Kohn, acting in his official and personal capacity, falsely claimed he sent a December 19, 2019 message to Guardians regarding commentary on its Facebook Page.

142. Defendant Kohn, acting in his official and personal capacity, manufactured the January 29, 2020 response to the records request, specifically 2 attachments containing approximately 20 screencaptures of comments that appear to be from the Facebook platform.

143. Defendant Kohn falsely represented the screencaptures as being the basis of the January 6, 2020 suspension letter, when such screencaptures were actually gathered by Defendant Kohn after the date of the letter.

144. Defendant Kohn intentionally concealed the date, location, and context of the screencaptures by cropping the images before producing them.

145. Defendant Kohn had a clear duty to provide accurate, non-mutilated public records pursuant to ORC Chapter 149.

146. The actions of Defendant Kohn described in the preceding paragraphs of this Complaint were knowing, willful, malicious, and intentional and designed to cause Guardian's rescue partner relationship to be terminated.

147. As a direct and proximate result of the acts as stated herein by Defendant Kohn, Plaintiff's constitutional rights have been violated and Plaintiff has suffered damages as will more fully appear at trial and their costs, including their reasonable attorneys' fees, pursuant 42 U.S.C. 1988.

## COUNT 6
## FRAUD
## AS TO THE MUTILATION OF PUBLIC RECORDS
## DEFENDANT KOHN

148. Plaintiff hereby incorporates by reference all allegations contained in all numbered paragraphs of this Complaint as if set forth fully here.

149. Defendant Kohn, acting in his official and personal capacity, manufactured the December 17, 2020 response to the records request, specifically by noting that a comment had been deleted by a user when it had not.

150. Defendant Kohn falsely represented the document as being an accurate public record.

151. Defendant Kohn intentionally concealed the fact that the comment had been hidden on the FCACC page by him or Doe.

152. Defendant Kohn had a clear duty to provide accurate, non-mutilated public records pursuant to ORC Chapter 149.

153. Defendant Kohn was motivated by malice or ill-will toward Guardians.

154. As a direct and proximate result of the acts as stated herein by Defendant Kohn, Plaintiff's constitutional rights have been violated and Plaintiff has suffered damages as will more fully appear at trial and their costs, including their reasonable attorneys' fees, pursuant 42 U.S.C. 1988.

## COUNT 7
## MANDAMUS
## PUBLIC RECORDS
## DEFENDANT FCACC, BOARD, AND KOHN

155. Plaintiff hereby incorporates by reference all allegations contained in all numbered paragraphs of this Complaint as if set forth fully here.

156. Defendant Kohn, in is official capacity, is the public official charged with management of the public records sought for purposes of Ohio Rev. Code §149.43 and this action.

157. The records as requested on February 5, 2020 and September 11, 2020 are public records for purposes of Ohio Rev. Code §149.011(G) and this action

158. To date, no response has been received to the February 5, 2020 public record requests, despite multiple demands.

159. To date, no adequate or revised response has been received to the September 11, 2020 public record requests, despite demands.

160. Defendants violated ORC §149.43 by failing to promptly provide the requested public records and/or otherwise failing to promptly respond to the public records request.

161. Defendants violated ORC §149.43 by wrongfully denying a request for the public records and/or otherwise failing to adequately respond to the public records request.

162. Defendants violated ORC §149.351 by wrongfully mutilating or otherwise damaging or disposing of the public records.

163. Plaintiff has met the established requirements for a writ to be issued: 1) Plaintiff has a clear legal right to the relief prayed for; 2) Defendants have a clear legal duty to perform the acts requested; and 3) Plaintiff has no plain and adequate remedy in the ordinary course of law. *State ex rel. Manson v. Morris*, 66 Ohio St.3d 440, 441 (1993).

164. As a direct and proximate result of these actions, Plaintiff is entitled to attorneys' fees, costs, and statutory damages.

## COUNT 8
## MONELL CLAIM
## DEFENDANTS FCACC, BOARD, PERSINGER, AND DOE

165. Plaintiff hereby incorporates by reference all allegations contained in all numbered paragraphs of this Complaint as if set forth fully here.

166. At all relevant times herein, Defendants, acting through the individual defendants, developed, implement, enforced, encouraged and sanctioned de facto policies, practices, and/or customs exhibiting deliberate indifference to Plaintiff's constitutional rights which caused violation of such rights.

167. Defendants' unlawful actions were done willfully, knowingly and with the specific intent to deprive Plaintiff of its conditional rights under the Fourteenth Amendment to the U.S. Constitution and the Ohio Constitution.

168. Defendants maintain a policy and/or custom of deliberate indifference to the rights of the citizens of Ohio, and such policy and/or custom is part of a pattern of unconstitutional violations by Defendants.

169. Defendants, knew, or should have known, that the Defendants would confront situations such as the events which form the basis of the actions herein stated.

170. The failure to provide its employees with proper and adequate training failed to furnish these individuals with appropriate knowledge to make proper and informed decisions which resulted in the deprivation of Plaintiff's constitutional rights.

171. Defendants pursued an official policy and/or custom of failing to provide adequate training, monitoring, and supervision of its employees in the performance of their duties and the protection of the constitutional rights of the citizens.

172. Defendants failed to provide adequate training, monitoring, and supervision of its employees, in the performance of their duties and to ensure the constitutional protections of citizens.

173. Defendants' failure to provide adequate training, monitoring, and supervision of its employees resulted in a deprivation of clearly established constitutional protections for citizens.

174. Defendants knew, or should have known, that the employees were acting in such a way as to violate the constitutional rights of citizens they encounter while performing their duties, and were aware of such constitutional violations, or should have been aware of such constitutional violations, had other similar incidents been properly investigated.

175. Defendant Kohn, his supervisors, and other employees had a legal duty and ample opportunity to intervene and prevent the unconstitutional conduct.

176. The failure of said Defendants to intervene was part of the pattern, practice, and custom to not intervene or report such incidents, but remain quiet to maintain silence and tacit acknowledgment and approval of such actions.

177. The constitutional violations committed by Defendants were and are directly and proximately caused by policies, practices, and/or customs developed, implemented, enforced, encouraged, and sanctioned by Defendants including the failure: (a) to adequately supervise and train its officers and agents, including the individual Defendants, thereby failing to adequately discourage further constitutional violations; (b) to properly and adequately monitor and discipline its employees, including Defendant Persinger and Defendant Kohn, and (c) to adequately and properly investigate citizen complaints.

178. As a direct and proximate result of the acts as stated herein by each of the Defendants, Plaintiff's constitutional rights have been violated which has caused it to suffer physical, mental, and emotional injury and pain, mental anguish, suffering, humiliation and embarrassment.

88. Plaintiff suffered, and continues to suffer, injuries and damages as a direct and proximate result of the above-described conduct of Defendants, as will more fully appear at trial, and their costs, including their reasonable attorneys' fees, pursuant 42 U.S.C. 1988.

## COUNT 9
### DECLARATORY AND INJUNCTIVE RELIEF
### RIGHT TO PULL DOGS
### DEFENDANT FCACC, BOARD, AND PERSINGER

179. Plaintiff hereby incorporates by reference all allegations contained in all numbered paragraphs of this Complaint as if set forth fully here.

180. There exists an actual, present, and justiciable controversy between Plaintiff and Defendants concerning Plaintiff's right to participate as a FCACC rescue partner.

181. There exists an actual, present, and justiciable controversy between Plaintiff and Defendants concerning Defendant's New Hope policy, which directly seeks to unlawfully regulate and restrict First Amendment speech of animal rescues and shelters.

182. The dogs that come into the custody of FCACC are public, governmental property once ownership of the dog is terminated by stray hold or otherwise.

183. The First Amendment speech of individuals other than animal rescues that assume ownership of dogs from FCACC is not restricted.

184. Adopters of dogs are not required to sign agreements that they will not disparage FCACC.

185. Without intervention by this court, Plaintiff, who wishes to participate in rescuing dogs from FCACC, but has been denied access, has no adequate remedy at law to protect the future lawful exercise of its constitutional rights and will suffer irreparable harm, thereby entitling it to injunctive relief.

186. This controversy is ripe for judicial decision, and declaratory relief is necessary and appropriate so that the parties may know the legal obligations that govern their present and future conduct.

187. If not enjoined by this Court, Defendants and their agents, representatives, and employees will continue to implement policies and practice that cause Plaintiff harm.

188. Plaintiff asks this Court to Order Defendants, as well as their agents, representatives, and employees, and all other persons acting in concert or participation with them, to immediately cease restricting Plaintiff and other individuals' right to participate as rescue partners when such denial is based on exercise of First Amendment rights and to hold that the New Hope program agreement violates those First Amendment rights.

## COUNT 10
### DECLARATORY AND INJUNCTIVE RELIEF
### FREE SPEECH ON A PUBLIC FORUM
### DEFENDANT FCACC, BOARD, PERSINGER, AND KOHN

189. Plaintiff hereby incorporates by reference all allegations contained in all numbered paragraphs of this Complaint as if set forth fully here.

190. There exists an actual, present, and justiciable controversy between Plaintiff and Defendants concerning Plaintiff's right to participate in public debate by posting, responding, and commenting on the FCACC Facebook Page.

191. There exists an actual, present, and justiciable controversy between Plaintiff and Defendants concerning Defendant's Social Media Policy, which directly seeks to unlawfully regulate and restrict First Amendment speech.

192. Without intervention by this court, Plaintiff, who wishes to participate in a public forum but has been denied access, has no adequate remedy at law to protect the future lawful exercise of its constitutional rights and will suffer irreparable harm, thereby entitling it to injunctive relief.

193. This controversy is ripe for judicial decision, and declaratory relief is necessary and appropriate so that the parties may know the legal obligations that govern their present and future conduct.

194. If not enjoined by this Court, Defendants and their agents, representatives, and employees will continue to implement policies and practice that cause Plaintiff harm.

195. Plaintiff asks this Court to Order Defendants, as well as their agents, representatives, and employees, and all other persons acting in concert or participation with them, to immediately cease restricting Plaintiff and other individuals' right to participate in public debate by posting, responding, and commenting on the FCACC Facebook Page and to hold that the "Social Media Policy" violates citizens' First Amendment rights.

### COUNT 11
### DECLARATORY AND INJUNCTIVE RELIEF
### DOG REGISTRATIONS
### DEFENDANT FCACC, BOARD, AND AUDITOR

196. Plaintiff hereby incorporates by reference all allegations contained in all numbered paragraphs of this Complaint as if set forth fully here.

197. Plaintiff avers that Defendants FCACC, the Board, and Auditor have wrongfully required Plaintiff, a 501(c)(3) nonprofit animal shelter organization, to pay a fee for dog registrations for is shelter dogs pursuant to ORC §955.01(C).

198. There exists an actual, present, and justiciable controversy between Plaintiff and Defendants regarding this issue.

199. Without intervention by this court, Plaintiff has no adequate remedy at law, subjects itself to possible criminal penalties for failure to register its dogs, subjects itself to possible seizure of its dogs, and will suffer irreparable harm, thereby entitling it to injunctive relief.

200. Defendants' course of conduct has caused, and will continue to cause, Plaintiff to suffer real and immediate threat of irreparable injury, as a result of the existence, operation, enforcement, and prosecution.

201. Plaintiff has no plain, speedy, or adequate remedy at law for such an injury.

Franklin County Ohio Clerk of Courts of the Common Pleas- 2021 Jan 14 1:04 PM-21CV000268
0F373 - A30

202. This controversy is ripe for judicial decision, and declaratory relief is necessary and appropriate so that the parties may know the legal obligations that govern their present and future conduct.

203. If not enjoined by this Court, Defendants and their agents, representatives, and employees will continue to implement policies and practice that cause Plaintiff harm.

204. Plaintiff asks this Court to Order Defendants, as well as their agents, representatives, and employees, and all other persons acting in concert or participation with them, to immediately cease charging a registration fee for dogs that belong to 501(c)(3) nonprofit animal shelter organizations.

## COUNT 12
### Attorney Fees - 42 U.S.C. § 1988

205. Plaintiff hereby incorporates by reference all allegations contained in all numbered paragraphs of this Complaint as if set forth fully here.

206. Pursuant to 42 U.S.C. § 1988, Plaintiff seeks attorney fees.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands Judgment as follows:

1. A writ of mandamus as to Count 7, directing the Defendants FCACC, the Board, and Kohn to comply with the requirements set forth in ORC §149.43, and specifically:

   a. require that Defendants immediately comply with Plaintiff's outstanding February 5, 2020 records request; and

   b. require that Defendants immediately and fully comply with Plaintiff's September 11, 2020 records request;

2. For preliminary and permanent injunctions as described in Counts 9, 10, and 11;

3. For declaratory relief as described in Counts 9, 10, 11;

4. For judgment in favor of Plaintiff and against the Defendants in an amount to be determined by the trier of fact in this matter and in the form of compensatory damages, statutory damages, plus interest and punitive damages;

5. For costs of the action and reasonable attorney fees; and

6. For any other and further relief to which the Plaintiff may be entitled.

### JURY DEMAND

The Plaintiff herein demands that this action be tried to a jury as provided by law.

Respectfully submitted,
HOLLAND & MUIRDEN

*/s/ DanaMarie K. Pannella*
DanaMarie K. Pannella (#0090221)
1343 Sharon-Copley Road, P. O. Box 345
Sharon Center, Ohio 44274
(330) 239-4480; Fax (330) 239-6224
E-mail: dpannella@hmlawohio.com